## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| **WILEY A. PERDUE** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE** |
| | ) | |
| **vs.** | ) | **NO. 1:15-CV-00380-MHC** |
| | ) | |
| **MOREHOUSE COLLEGE, INC.** | ) | **JURY TRIAL DEMANDED** |
| **d/b/a** | ) | |
| **MOREHOUSE COLLEGE and the** | ) | |
| **BOARD OF TRUSTEES OF** | ) | |
| **MOREHOUSE COLLEGE.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

Plaintiff Wiley A. Perdue ("Perdue" or "Plaintiff"), pursuant to Federal

Rule of Civil Procedure 15, hereby amends his complaint against Defendants

Morehouse College, Inc. ("Morehouse College" or the "College") and the Board

of Trustees of Morehouse College ("Board of Trustees") (collectively

"Defendants" or "Morehouse"), and alleges as follows:

## PRELIMINARY STATEMENT

Dr. Perdue brings this action against his former employer and alma mater,

Morehouse College, and the Morehouse College Board of Trustees, for going

back on the promise they made many years ago to provide certain stated

retirement benefits for the duration of Dr. Perdue's life.  Dr. Perdue's relationship

with Morehouse extends back to the 1950s, when Dr. Perdue began working in

1

the business office while an undergraduate student.  In the ensuing years, he rose through the ranks to serve as Vice President for Business and Finance and, beginning in 1994, as Acting President during the presidential search that led to hiring Morehouse's current President.

As Acting President, Dr. Perdue shepherded the College through a difficult time.  According to then-acting chairman of the Morehouse Board of Trustees, Dr. Perdue gave "exceptional leadership to [Morehouse] College at a critical moment of challenge and change."  Echoing this sentiment, Morehouse past-president Dr. Hugh M. Gloster described Dr. Perdue as "one of the best acting presidents [he] ha[d] ever known."  In 1995, after Dr. Perdue had seen the College through its transition to a new President, Dr. Perdue returned full time to the post of Vice President for Business Affairs and Assistant Treasurer, with plans to continue serving the College and his alma mater for many years to come. The incoming President, however, preferred to hire his own officers. Accordingly, the Board offered Dr. Perdue an early retirement package, which Dr. Perdue accepted in 1996 (the "1996 Retirement Agreement")

After Dr. Perdue retired, the College communicated to Dr. Perdue that, unless he agreed to certain changes in his retirement package, it would compute a future value for the package and report taxable income of approximately one million dollars to the IRS for the 1996 tax year.  Unable to pay the nearly

$500,000.00 tax bill that would have resulted from such a reporting, Dr. Perdue believed he had no choice but to accept the College's 1997 proposal (the "1997 Term Sheet").  The 1997 Term Sheet included the following provision that had not existed in Dr. Perdue's 1996 Retirement Agreement:

> Morehouse College's Board of Trustees as of January 1, 1998 and as of the first day of each calendar year thereafter shall decide (1) whether to continue to pay Dr. Perdue a monthly deferred compensation benefit for the remainder of each such calendar year or through the month in such calendar year in which Dr. Perdue dies, whichever comes first . . . and (2) the amount, if any, of such monthly deferred compensation benefit for such calendar year.

When the College proposed this change, it represented to Dr. Perdue that an annual review provision was necessary to address the tax issue that otherwise would leave Perdue with a $500,000 tax bill.  Moreover, the then-current Chairman of the Board, the Reverend Otis Moss, assured Dr. Perdue that this provision was included solely for tax purposes and would never be used to stop or reduce Dr. Perdue's retirement benefits.  To this day, Reverend Moss shares this recollection.  Based on these representations, Perdue agreed to this language in the 1997 Term Sheet.  Given the confidential relationship shared by Perdue and each of the Defendants, the Defendants owed Perdue a duty of loyalty and the utmost good faith, such that Perdue was entitled to rely upon the Defendants' assurances.

After nearly two decades of abiding by this promise and the College's responsibility to pay Dr. Perdue's monthly retirement benefit, on August 18, 2014, the Board of Trustees unilaterally announced to Dr. Perdue in a letter that the College would terminate his monthly retirement payments at the end of the 2014 calendar year.  In seeking to terminate Perdue's payments, the Defendants now rely upon the annual review provision of the 1997 Term Sheet that they promised was included only to resolve a tax issue and would never be construed to stop or reduce his benefit payment.  By ceasing Dr. Perdue's monthly retirement benefits in the last years of his life, Defendants would violate their duties to Perdue and breach of their enforceable promise not to do so – all to save the College $68,754.00 per year.

When Morehouse needed him most, Dr. Perdue rose to the occasion and led the College through a challenging transition.  Now, when Dr. Perdue most needs Morehouse to keep its word and abide by its principles of loyalty and integrity, the College and its Board of Trustees have deserted him for their short-term financial gain.

## FACTUAL ALLEGATIONS

### The Parties, Jurisdiction, and Venue

1.

Plaintiff is a resident of Atlanta Georgia, currently residing at 1300 Melbenan Dr., SW, Atlanta, Georgia 30311.

2.

Defendant Morehouse College Inc., d/b/a Morehouse College is a private, non-profit, liberal arts college, incorporated under the laws of the State of Georgia, with a principal place of business located at 830 Westview Drive, Atlanta, Georgia 30314.  Morehouse College may be served with process through its registered agent, Dr. Alan D. Robertson, Sr., at 830 Westview Drive, Atlanta, Georgia 30314.

3.

Defendant Board of Trustees of Morehouse College is, according to their website, "the ultimate governing authority of [Morehouse] College" and may be served with summons and a copy of this complaint by serving the Chairman appointed by the Board of Trustees of Morehouse College, Robert C. Davidson, Jr.

4.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1367.

5.

Venue is proper in this Court.

### Dr. Perdue – A Morehouse Man Who Responded to the Call of Leadership and Service

6.

Plaintiff Perdue matriculated at Morehouse College as an incoming freshman in the fall of 1953 and graduated four years later with the class of 1957.

7.

While an undergraduate student, Dr. Perdue worked in the Morehouse business office.

8.

Following graduation from Morehouse, Plaintiff Perdue earned his master's degree in business administration from Atlanta University in 1958.  He then accepted an instructor position at Savannah State College, where he later held the posts of registrar, director of admissions, director and operator of the computer center, and professor of business administration.

9.

In 1969, Dr. Perdue joined the Morehouse staff as Registrar.  Over the next couple of decades, Perdue rose through the ranks at Morehouse to serve as Vice President for Business and Finance.

10.

In 1994, the Board of Trustees called upon Dr. Perdue to serve as Acting President during the presidential search that resulted in the recruitment of President Walter Massey.

11.

Dr. Perdue served as acting president of Morehouse College from October 1, 1994 to August 13, 1995.

## Perdue is Induced Into Early Retirement With A Retirement Benefit Package

12.

After fulfilling his role as Acting President, Dr. Perdue returned full-time in August 1995 to the post of Vice President for Business Affairs and Assistant Treasurer and planned to work for many years to come.

13.

Incoming President Massey, however, indicated that he preferred to have officers of his own choosing.

14.

Morehouse College made an early retirement offer to Dr. Perdue, which was approved by the Board in November 1995.

15.

Dr. Perdue accepted the offer and retired as of June 30, 1996 ("1996 Retirement Agreement").

16.

By letter dated July 11, 1996, then-chairman of the Board of Trustees Otis Moss Jr. confirmed Dr. Perdue's benefits.

17.

The benefits provided to Dr. Perdue under the 1996 Retirement Agreement included, among other things, a "retirement benefit equal to one-half of your final annual compensation."

**Morehouse College Induces Dr. Perdue to Enter A Modified Agreement**

18.

After Dr. Perdue retired, the College communicated to Dr. Perdue that, unless he agreed to certain changes in his retirement package, the College would compute a future value for the package and would report taxable income of approximately one million dollars to the IRS for tax year 1996.

19.

Had the College reported taxable income of nearly one million dollars, Dr. Perdue would have received a tax bill of almost $500,000.00.

20.

Unable to pay the nearly $500,000.00 tax bill that would have resulted from such a reporting, Dr. Perdue believed he had no choice but to accept the College's 1997 proposal (the "1997 Term Sheet").

**The 1997 Final Settlement Term Sheet and the Board of Trustee's Oral Promise**

21.

The 1997 Term Sheet included the following provision ("annual review provision") that had not existed in Dr. Perdue's 1996 Retirement Agreement:

Morehouse College's Board of Trustees as of January 1, 1998 and as of the first day of each calendar year thereafter shall decide (1) whether to continue to pay Dr. Perdue a monthly deferred compensation benefit for the remainder of each such calendar year or through the month in such calendar year in which Dr. Perdue dies, whichever comes first . . . and (2) the amount, if any, of such monthly deferred compensation benefit for such calendar year.

22.

When the College proposed this change, it represented to Dr. Perdue that the annual review provision was necessary to address the tax issue that otherwise would leave Perdue with a $500,000 tax bill.

9

23.

Dr. Perdue expressed his unwillingness to agree to the annual review provision, fearing it would give the Board of Trustees discretion to terminate his benefits at a future date.

24.

During a phone conversation, the then-current Chairman of the Board of Trustees, the Rev. Otis Moss assured Dr. Perdue that the annual review provision was included solely for tax purposes and would never be used to stop or reduce Dr. Perdue's retirement benefits.

25.

Rev. Moss recently confirmed during a conversation with Dr. Perdue that he shares Perdue's recollection of their earlier discussion about the annual review provision.

26.

Dr. Perdue agreed to the annual review provision in the 1997 Term Sheet **only** on the basis of the College's representations that this was the only solution to the tax issue, and **only** after Rev. Moss assured Perdue that the language was there solely for tax purposes and would not be used to stop or reduce Dr. Perdue's retirement benefits.

27.

In reliance on the Defendants' promises, Dr. Purdue agreed to the 1997 Term Sheet, which reduced the benefits Dr. Perdue already had under the 1996 Retirement Agreement.

28.

Among other obligations, the 1997 Term Sheet obligated Morehouse College to "purchase a life insurance policy on Dr. Perdue's life for the benefit of Dr. Perdue's beneficiary, and the total amount payable in 1997 at Dr. Perdue's death to his beneficiary under such policy shall equal $465,000."

29.

Pursuant to that provision of the 1997 Term Sheet, Morehouse purchased a life insurance policy on Dr. Perdue's life, payable to Dr. Perdue's beneficiary (the "1997 Policy"). The 1997 Policy was in addition to, not in place of, a pre-existing policy that Morehouse had purchased on Dr. Perdue's life in the early 1990s, when he was a Vice-President at Morehouse.

**Defendants Repudiate and Breach Their Agreement**

30.

For nearly two decades, the Defendants stood by their promise and the College fulfilled its responsibility to pay Dr. Perdue's monthly retirement benefit.

31.

On August 18, 2014, the Board of Trustees unilaterally announced to Dr. Perdue in a letter that the College would "cease [Perdue's] monthly severance payments at the end of December 2014."

32.

In addition, upon information and belief, Morehouse has changed the beneficiary on the 1997 Policy so that Dr. Perdue no longer obtains any benefit from it.

33.

If the Defendants terminate Dr. Perdue's benefits, Dr. Perdue will suffer significant hardship.

## COUNT ONE – MONETARY RELIEF

34.

As set forth in paragraphs 12-27, Morehouse College had a contractual obligation to provide Plaintiff Perdue with monthly retirement benefit payments for life.

35.

As set forth in paragraphs 30-33, Defendant Board of Trustees, acting on behalf of Morehouse College has indicated that the College will cease paying Dr.

Perdue's monthly benefit, amounting to an unqualified repudiation of their contractual obligation.

36.

These anticipatory repudiations by Defendants constitute a breach of Defendant Morehouse College's contractual obligation to pay Dr. Perdue monthly retirement benefit payments for Perdue's life.

37.

As a result of this anticipatory breach, Dr. Perdue has suffered and will suffer damages, including without limitation expectation damages.

38.

The plain language of the 1997 Term Sheet obligated Defendants to purchase a policy of insurance on Dr. Perdue's life, for the benefit of his beneficiary. Pursuant to that agreement, Defendants purchased and maintained the 1997 Policy.

39.

Upon information and belief, at some point during 2013, Defendants changed the beneficiary of the 1997 Policy without Dr. Perdue's agreement so that Defendants, rather than Dr. Perdue's beneficiary, would benefit from the Policy and receive the death benefit when payable.

40.

By changing the beneficiary of the 1997 Policy, Defendants breached the 1997 Term Sheet and deprived Dr. Perdue of a significant benefit which he was contractually entitled to receive.

41.

The provisions of the 1997 Term Sheet, and other terms agreed to by the parties at the time the 1997 Term Sheet was negotiated, constitute a "Plan" under the Employee Retirement Income Security Act of 1974 ("ERISA").

42.

Among the other terms of the Plan, Defendants agreed that the annual review provision contained within the 1997 Term Sheet was not to be used to reduce or eliminate Dr. Perdue's monthly retirement benefit. The Plan also required Defendants to purchase and pay the premiums on a policy of insurance on Dr. Perdue's life, payable to his beneficiary at his death.

43.

In breach of the Plan, Defendants have repudiated their obligation to pay Dr. Perdue's monthly retirement benefit, and have unilaterally changed the terms of the required policy of life insurance so that it is no longer payable to Dr. Perdue's beneficiary.

44.

As a proximate and foreseeable result of Defendants' breaches of the Plan, Dr. Perdue has suffered monetary damages in an amount to be determined at trial.

## COUNT TWO – BREACH OF FIDUCIARY DUTY

45.

As set forth in paragraphs 12-20, the Defendants held unequal bargaining power when they presented Dr. Perdue with an ultimatum to either accept certain changes to his retirement benefit package or be faced with an imminent tax bill of almost $500,000.00.  Moreover, having been induced into retirement, Plaintiff Perdue's retirement income was dependent on being a recipient of funds from Morehouse College. For these reasons, Defendants were so situated as to exercise a controlling influence over Dr. Perdue's will and conduct, creating a confidential relationship under O.C.G.A. § 23-2-58. To the extent that the 1996 Retirement Agreement was not exempt from ERISA's fiduciary duty provision, Morehouse also owed Perdue fiduciary duties under that provision.

46.

As a result of the confidential relationship, Defendants owed Dr. Perdue the duty of loyalty and utmost good faith.

47.

Moreover, given Perdue's confidential relationship with the Defendants, he was entitled to rely on their assurances that they would not use the annual review provision to stop or reduce Dr. Perdue's retirement benefits.

48.

As set forth in paragraphs 14-29, Defendants have failed to act with the utmost good faith and candor.

49.

Among other things, Defendants breached their heightened duties to Dr. Perdue when they induced Perdue into retirement with the 1996 Retirement Agreement only to issue an ultimatum, demanding him to accept proposed changes to this agreement or face a $500,000 tax bill.

50.

Defendants further breached their fiduciary duties to Dr. Perdue when they induced Dr. Perdue to agree to the 1997 Term Sheet on the basis of the College's representations that the annual review provision was the only solution to the stated tax issue and on Rev. Moss's representations that the provision would not be used to stop or reduce his retirement benefits.

51.

Moreover, even assuming the Defendants retained discretion to use the annual review provision to stop or reduce Dr. Perdue's retirement benefits, Defendants had a heightened duty to Dr. Perdue to exercise any discretion with the utmost good faith and loyalty, which they failed to do.

52.

As a proximate result of Defendants' failure to act with the utmost good faith, Plaintiff Perdue has sustained damages, including but not limited to loss of income, loss of earning capacity, personal suffering, mental anguish and stress.

## COUNT THREE – EQUITABLE REMEDIES

53.

As set forth in paragraphs 21-25, Defendants promised Dr. Perdue that the annual review provision was included in the 1997 Term Sheet solely for tax purposes and would not be used to stop or reduce Dr. Perdue's retirement benefits.

54.

Rev. Moss's promise to Dr. Perdue that the annual review provision was included solely for tax purposes and would not operate to stop or reduce Dr. Perdue's retirement benefits was a promise that Rev. Moss reasonably should have expected would induce Dr. Perdue's agreement to the 1997 Term Sheet.

55.

As set forth in paragraphs 26-27, Dr. Perdue reasonably relied on the Defendants' promises when he agreed to the 1997 Term Sheet, which was a significant reduction in benefits he already had under the 1996 Retirement Agreement.

56.

Injustice can only be avoided by enforcement of the Defendants' promise, as Dr. Perdue otherwise would have taken affirmative steps to protect his and his family's financial security by some other means.

57.

It was the intent of the parties, and was represented to Dr. Perdue by Morehouse, that the annual review provision contained in the 1997 Term Sheet would not be used to terminate or reduce Dr. Perdue's deferred compensation benefit.

58.

Dr. Perdue's assent to the annual review provision was induced by Morehouse's representation that it would not be used to terminate or reduce Dr. Perdue's benefit, a representation upon which Dr. Perdue reasonably relied. Morehouse now takes the position that this representation regarding the terms and/or effect of the annual review provision was not true.

18

59.

Morehouse induced Dr. Perdue's assent to the annual review provision, in part, by representing to Dr. Perdue that the inclusion of that provision was the only way Morehouse would agree not to create massive tax liability for Dr. Perdue by reporting to the IRS that he had received more than a million dollars in income. Dr. Perdue's assent was obtained under duress and undue influence.

60.

To prevent injustice, this Court should award equitable relief under Section 502(a)(3) of ERISA, including without limitation the remedies of reformation and/or estoppel.

61.

In addition, upon information and belief, Defendant has wrongfully deprived Dr. Perdue of benefits provided by the 1997 Term Sheet, and has unjustly enriched itself, by designating itself as beneficiary of the policy of life insurance that it purchased on Dr. Perdue's life pursuant to the 1997 Term Sheet.

62.

To prevent injustice, this Court should award equitable relief, including but not limited to an order requiring Morehouse to restore Dr. Perdue's pre-existing designation of his beneficiary, and/or an award of restitution.

## COUNT FOUR – ATTORNEYS' FEES AND COSTS

### 63.

Defendants have acted in bad faith, been stubbornly litigious, and caused Dr. Perdue unnecessary trouble and expense within the meaning of O.C.G.A. § 13-6-11.

### 64.

In addition, pursuant to ERISA Section 502(g)(1), Defendants are liable to Dr. Perdue for reasonable attorney's fees and costs of this action.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully pray for the following relief:

(1)     That Plaintiff Perdue has a trial by jury of all issues so triable;

(2)     That the Court enter judgment in favor of Plaintiff and order compensatory damages against each Defendant in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(3)     That the Court award Dr. Perdue damages caused by Defendants' breach of duties arising from a confidential relationship;

(4)     That the Court award Plaintiff the costs of this suit, including reasonable attorneys' fees, expenses, and costs of litigation under O.C.G.A. § 13-6-11 and ERISA; and

(5)     That the Court provide such other and further relief as this Court

may deem just, equitable, and proper, including but not limited to the equitable

remedies of estoppel, reformation, injunction, and restitution, as pleaded above.

### JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  March 2, 2015                  Respectfully submitted,


*s/ Leighton Moore*
Leighton Moore
Georgia Bar No. 520701


The Moore Law Firm, P.C.
400 Colony Square, Suite 2000
1201 Peachtree Street NE
Atlanta, GA 30361
Tel. 678.237.0330
Leighton@moorefirmpc.com

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that the foregoing Amended Complaint is prepared in 14-point Times New Roman font, and that I have this day electronically filed with the Clerk of Court the foregoing Amended Complaint, using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This 2nd day of March, 2015.

*s/ Leighton Moore*
Georgia Bar No. 520701